Argued and submitted March 1, reversed and remanded in part; otherwise affirmed
October 20, 1993

Jeddediah AYLETT
and Juanita Aylett,
*Appellants,*

*v.*

UNIVERSAL FROZEN FOODS CO.,
an Oregon corporation,
*Respondent.*

(9110-06420; CA A75957)

861 P2d 375

Gregory A. Hartman argued the cause for appellants. With him on the briefs was Bennett & Hartman.

John R. Barker argued the cause for respondent. With him on the brief were Margaret B. Oslund and Bittner & Barker, P.C.

Before Warren, Presiding Judge, and Edmonds and Landau, Judges.

LANDAU, J.

**LANDAU, J.**

Plaintiffs appeal from a summary judgment for defendant in this action for breach of the contractual duty of good faith and fair dealing and for intentional interference with "prospective business advantage." We review each claim to determine whether defendant demonstrated that it is entitled to judgment as a matter of law. *Seeborg v. General Motors Corporation*, 284 Or 695, 699, 588 P2d 1100 (1978). We view the evidence in the light most favorable to plaintiffs. 284 Or at 699.

Plaintiffs are potato growers, and defendant is a potato processor. Each year before harvest, potato grower cooperatives negotiate contracts that govern preharvest sales of potatoes. Potatoes that are offered for sale after harvest are called "open potatoes," because they can be sold competitively on the open market.

In 1990, plaintiffs and defendant entered into a contract for the sale of open potatoes that contained the same terms as the preharvest contract that defendant had entered with the grower's cooperative. The contract included this provision:

> "[Defendant] has the right of first refusal on any open market potatoes grown by [plaintiffs]. [Defendant] has 48 hours after being notified of an offer to respond."

Defendant purchased average quality open potatoes from plaintiffs in August. In October, defendant tested plaintiffs' potatoes and declined to purchase them, because they were of lower quality than those purchased in August. By November and December of 1990, defendant's "emphasis was on locating good quality" potatoes.

On December 10, defendant's largest competitor, Lamb Weston, offered plaintiffs $90 per ton for their open potatoes. Plaintiffs refused that offer and made a counteroffer to sell for $150 per ton. Lamb Weston agreed to negotiate a price between $90 and $150 per ton, but it did not make another offer that day. Plaintiffs notified defendant that Lamb Weston had made an offer of $90 per ton and that they were going to continue negotiating for some price between $90 and $150 per ton. Plaintiffs asked defendant if it was interested in buying the potatoes. Defendant responded that

it would have to receive a written offer before it could decide whether to exercise its right of first refusal.

On December 14, Lamb Weston's representative went to plaintiffs' house and told plaintiffs that his company was prepared to offer more than $100 per ton for potatoes. However, he told plaintiffs that he did not want to engage in "bidding" against defendant and, therefore, he would not specify a price until defendant released its right of first refusal. Nevertheless, he agreed to try to persuade Lamb Weston to make an offer in writing that afternoon. Plaintiffs informed defendant that a written offer would be forthcoming. Defendant sent an employee to plaintiffs' house to obtain a sample of the potatoes for testing and to pick up the written offer. The employee gathered the sample but, while he was still at plaintiffs' house, Lamb Weston phoned and informed plaintiffs that it would not be making an offer on any potatoes at that time. The reason for Lamb Weston's loss of interest was apparently related to a potato crop report that had been released earlier that afternoon.

A few days later, defendant completed its tests and determined that plaintiffs' potatoes were of an unacceptable quality. It then released its right of first refusal. Plaintiffs ultimately sold their potatoes to Lamb Weston in April, 1991, for $65 per ton. Plaintiffs then filed this action, claiming breach of contract and intentional interference with prospective business advantage. Defendant moved for summary judgment on both claims, which the trial court granted.

■   Plaintiffs first assign error to the trial court's entry of summary judgment on their claim for breach of contract. They rely on the common law duty of good faith and fair dealing, which requires a party to act in accordance with reasonable expectations. *Best v. U.S. National Bank*, 303 Or 557, 561, 739 P2d 554 (1987). Plaintiffs offered testimony that the practice in the potato industry is for the holder of a right of first refusal to release that right "immediately when informed of an offer" from a third party, without insisting on a written offer. Defendant's insistence on a written offer, they conclude, was not consistent with that practice and, therefore, was contrary to the reasonable expectations of the parties.

Defendant concedes that there is a common law duty of good faith and fair dealing to effectuate the reasonable contractual expectations of the parties. It argues that the duty simply is not implicated in this case. We agree.

At the outset, we observe that both plaintiffs and defendant rely exclusively on the common law duty of good faith and fair dealing, when the contract at issue concerns a sale of goods. ORS 72.1050(1). As we said in *Chaney v. Shell Oil Co.*, 111 Or App 556, 568, 827 P2d 196, *rev den* 313 Or 299 (1992), the legislature intended that the obligation of good faith described in the Uniform Commercial Code replace the common law duty where a contract for the sale of goods is concerned. *See also U.S. National Bank v. Boge*, 311 Or 550, 556-64, 814 P2d 1082 (1991).

The Uniform Commercial Code, as adopted by the legislature, provides that

> "[e]very contract or duty within the Uniform Commercial Code imposes an obligation of good faith in its performance or enforcement." ORS 71.2030.

"Good faith," in the case of merchants engaged in the sale of goods, means

> "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." ORS 72.1030(1)(b).

We have previously described that definition as including two components: a subjective component of "honesty in fact" and an objective component of "observance of reasonable commercial standards," which we have construed to mean the reasonable expectations of the parties. *Chaney v. Shell Oil Co., supra*, 111 Or App at 569.

Here, plaintiffs have not alleged a breach of the subjective component. Their sole claim is that defendant did not act in accordance with the reasonable expectation of the parties, by failing either to exercise or to relinquish its right of first refusal upon notice of an offer from Lamb Weston. The linchpin of plaintiffs' argument, however, is their assumption that there ever was notice of an offer from Lamb Weston. It is an assumption that does not bear scrutiny.

■      The first time plaintiffs attempted to obtain a release of the right of first refusal, there was no offer pending. Plaintiffs had, that day, rejected Lamb Weston's offer of $90 per ton. A rejected offer is not sufficient to trigger a right of first refusal. *See Long v. Wayble*, 48 Or App 851, 855, 618 P2d 22 (1980), *rev den* 290 Or 491 (1981). Plaintiffs notified defendant of the unsuccessful transaction and of their hope that further negotiations would prove fruitful. Nevertheless, plaintiffs did not — and, indeed, could not — advise defendant of an offer at that point.

Four days later, Lamb Weston told plaintiffs that, although it wanted to buy their potatoes, it did not want to specify a price until defendant released its rights under the contract. Plaintiffs informed defendant that an offer probably was forthcoming and asked defendant to waive its right of first refusal. However, once again, there was no offer to purchase potatoes at that time.

Given that plaintiffs at no time notified defendant of an offer, the contract did not obligate defendant even to consider relinquishing its right of first refusal, much less to exercise good faith in deciding whether to actually do so.

Plaintiffs assert that it is inconsistent with industry practice to insist on a pending offer before considering whether to exercise right of first refusal. According to plaintiffs, it is customary for potato processors to respond to notice of mere negotiations. That, however, is not what the contract between plaintiffs and defendant says. It unambiguously requires notice of an offer, not merely negotiations. Moreover, the evidence plaintiffs offer does not support their construction of the agreement. The only evidence of industry practice consists of affidavit testimony that a *written* offer is not required to trigger defendant's duty to respond. Nothing in the testimony supports the contention that no offer at all is required. The trial court properly concluded that defendant was entitled to summary judgment on the claim for breach of the duty of good faith.

■      Plaintiffs next assign error to the trial court's entry of summary judgment on their claim for intentional interference with prospective business relations. Plaintiffs argue

that they produced evidence raising a genuine issue of material fact on each of the elements of the tort. Defendant argues that there is a complete absence of proof as to all of those elements.[1] To prevail on their intentional interference claim, plaintiffs must show:

"(1)   The defendant intentionally interfered with the proposed relationship;

"(2)   [The defendant] interfered either with an improper motive or with an improper means; and

"(3)   As a result the plaintiff was damaged beyond just the fact of the interference itself." *Ron Tonkin Gran Turismo v. Wakehouse Motors*, 46 Or App 199, 208, 611 P2d 658 (1980), citing *Straube v. Larson*, 287 Or 357, 360, 600 P2d 371 (1979).

We conclude that plaintiffs have produced evidence that raises an issue of fact with respect to each of those elements.

■         First, concerning the element of intentional interference, it is sufficient that there is proof that defendant knows that interference is substantially certain to occur from its action. *Straube v. Larson, supra,* 287 Or at 360. Here, there is evidence that defendant had never before demanded a written offer from any grower before relinquishing its right of first refusal; that defendant knew of the extreme volatility in the potato market at the time of plaintiffs' negotiations with

---

[1] Defendant also argues that the trial court properly disposed of the tort claim because plaintiffs cannot recover in tort for failure to perform a contractual duty absent a special relationship between the parties. Defendant relies on *Georgetown Realty v. The Home Ins. Co.*, 313 Or 97, 831 P2d 7 (1992). Its reliance is misplaced. In *Georgetown Realty*, the court held that a special relationship is required if the plaintiff's tort claim is based on negligent performance of a contractual duty. 313 Or at 106. The court explained:

"If the plaintiff's claim is based solely on a breach of a provision in the contract, which itself spells out the party's obligation, then the remedy normally will be only in contract." 313 Or at 106.

The court did *not* say, as defendant asserts, that a plaintiff who is in a contractual relationship with a defendant can assert a tort claim only if the contract gives rise to a special relationship. In fact, the court explained that,

"[i]n some situations, a party may be able to rely on either a contract theory or a tort theory or both." 313 Or at 106.

That is, conduct that does not constitute a breach of contract may nonetheless be tortious, and some conduct may be both a breach of contract and tortious. In short, *Georgetown Realty* does not require plaintiffs to prove any special relationship to defendant in order to proceed with a claim for tortious interference with a business relationship.

Lamb Weston; that defendant was monitoring Lamb Weston's purchases at that time and that it knew that Lamb Weston was actively buying potatoes at prices of more than $90 per ton. That evidence could reasonably support a finding that defendant knew that its insistence on the receipt of a written offer would delay plaintiffs' negotiations with Lamb Weston and that the delay was substantially certain to have an adverse effect on those negotiations.

Defendant insists that such a finding is not supportable in the light of evidence that other transactions in which a written offer was required nevertheless closed without incident. According to defendant, that evidence demonstrates that its conduct cannot give rise to a claim for intentional interference. The argument, however, does not necessarily follow. Evidence regarding other transactions merely provides the basis for drawing inferences in defendant's favor. The success of other transactions does not conclusively demonstrate that defendant could not have known that its insistence on a written offer would adversely affect the particular transaction between plaintiffs and Lamb Weston.

Second, concerning the element of improper motive, there is evidence that defendant was aware of the quality of plaintiffs' potatoes and was not interested in purchasing potatoes of that quality. Moreover, defendant's representative admitted that at least part of the reason for demanding a written offer was to retaliate against Lamb Weston, which had demanded written offers from other growers when defendant had tried to purchase potatoes. That evidence is sufficient to raise a jury question about defendant's motives.

Defendant argues that the evidence is insufficient to establish improper motive, because it only shows that defendant was pursuing its own legitimate business objectives. Defendant is wrong. Its argument merely suggests competing inferences that may be drawn from the evidence. Although it may be reasonable to infer from the evidence that defendant was pursuing its legitimate business purposes, that is not necessarily the only conclusion that reasonably may be drawn from the evidence. There is evidence from which a jury could infer that defendant's motives were retaliatory. That evidence is sufficient to satisfy the improper motive requirement. *Straube v. Larson, supra,* 287 Or at 368.

■ Defendant argues that, even if the evidence justifies an inference of retaliation, that evidence suggests only that the retaliation was directed at Lamb Weston, not plaintiffs. It relies on *Top Service Body Shop v. Allstate Ins. Co.*, 283 Or 201, 582 P2d 1365 (1978). That case, however, provides no support for defendant's argument. In *Top Service*, the plaintiff alleged that the defendant's tortious interference was motivated by a desire to injure the plaintiff. The court held that the plaintiff had failed to produce any evidence in support of its allegation. It concluded that the evidence merely showed that the defendant had acted consistently with legitimate business purposes. Nowhere did the court say that, to prove a claim for tortious interference, there *must* be evidence that the defendant intended to injure the plaintiff, as opposed to anyone else.

Third, concerning the element of damages, there is evidence of the quality of the potatoes that plaintiffs had for sale, the baseline price of potatoes, the market conditions at the time and the price range within which Lamb Weston had agreed to negotiate. A jury reasonably could calculate plaintiffs' damages based on that evidence. Defendant contends that some of the evidence of damages is insufficient because it is hearsay testimony. Defendant, however, did not object to or move to strike any of the evidence from the summary judgment record on any ground, and we will not consider defendant's objection for the first time on appeal. *Flavel v. Pacific Power & Light*, 43 Or App 917, 920, 607 P2d 731 (1979), *rev den* 289 Or 45 (1980). In any event, the other evidence that would not be subject to the hearsay objection is sufficient to raise a jury question on that element.

In their third assignment of error, plaintiffs argue that the trial court improperly calculated the portion of defendant's attorney fees attributable to work on the contract claim. The amount of attorney fees attributable to the contract claim is a question of fact, and we may not reverse the trial court's findings unless there is no evidence to support them. *State High. Com. et al v. Kendrick et al*, 227 Or 608, 363 P2d 1078 (1961). The trial court's findings are supported by evidence. It did not err.

Reversed and remanded on claim for intentional interference with business relations; otherwise affirmed.