Argued and submitted June 16, 2005, affirmed on plaintiffs' appeal; affirmed on
defendants' appeal from supplemental judgment denying attorney fees
January 11, 2006

## DOUGLAS MEDICAL CENTER, LLC,
dba Douglas Community Medical Center,
and Triad Holdings III, Inc.,
*Appellants,*

*v.*

## MERCY MEDICAL CENTER,
*Respondent,*

*and*

## ROSEBURG SURGICENTER, INC.,
Professional Management of Oregon, Inc., and Dell Gray,
*Defendants.*

## ROSEBURG SURGICENTER, INC.,
and Roseburg Surgicenter, Ltd.,
*Counterclaim Plaintiffs,*

*v.*

## DOUGLAS MEDICAL CENTER, LLC,
and Triad Holdings III, Inc., and Triad Hospitals, Inc.,
*Counterclaim Defendants.*

## ROSEBURG SURGICENTER, INC.,
Roseburg Surgicenter, Ltd., Professional Management of
Oregon, Inc., and Dell Gray,
*Attorney Fees and Costs Appellants,*

*and*

## MERCY MEDICAL CENTER,
*Attorney Fees and Costs Claimant below,*

*v.*

## DOUGLAS MEDICAL CENTER, LLC,
dba Douglas Community Medical Center,
and Triad Holdings III, Inc.,
*Attorney Fees and Costs Respondents.*

## 99CV2265CC; A118908

125 P3d 1281

Thomas W. Sondag argued the cause for appellants Douglas Medical Center, LLC, dba Douglas Community Medical Center, and Triad Holdings III, Inc. With him on the opening brief was Lane Powell Spears Lubersky LLP. On the reply brief was Lane Powell PC.

Thomas W. Brown argued the cause for respondent Mercy Medical Center. With him on the brief were Wendy M. Margolis and Cosgrave Vergeer Kester LLP.

Wm. Randolph Turnbow argued the cause for attorney fees and costs appellants Roseburg Surgicenter, Inc., Roseburg Surgicenter, Ltd., Professional Management of Oregon, Inc., and Dell Gray. With him on the brief was Hershner Hunter, LLP.

Thomas W. Sondag argued the cause for attorney fees and costs respondents Douglas Medical Center, LLC, dba Douglas Community Medical Center, and Triad Holdings III, Inc. With him on the brief was Lane Powell Spears Lubersky LLP.

Before Haselton, Presiding Judge, and Linder and Rosenblum,* Judges.

HASELTON, P. J.

* Rosenblum, J., *vice* Ceniceros, S. J.

**HASELTON, P. J.**

Plaintiffs Douglas Medical Center, LLC, and Triad Holdings III, Inc., appeal, challenging the trial court's allowance of a directed verdict in favor of defendant Mercy Medical Center (Mercy) on their claims for intentional interference with economic relations and for misappropriation of trade secrets under the Oregon Uniform Trade Secrets Act, ORS 646.461 to 646.475. Defendants other than Mercy appeal from a supplemental judgment denying their requests for attorney fees. We reject without discussion plaintiffs' arguments concerning their trade-secret-related claims; we also reject without discussion the non-Mercy defendants' arguments concerning their alleged entitlement to attorney fees and, accordingly, affirm the supplemental judgment. We write only to address the propriety of the directed verdict against plaintiffs on their claim for intentional interference with economic relations. For the reasons that follow, we conclude that the trial court did not err in that regard and, consequently, affirm.

This case arises from circumstances recurring and familiar in modern America: A community historically supported two hospitals. With regionalization and consolidation of medical care, only one can survive. Who is to survive—and how? Plaintiffs contend principally that Mercy, in seeking to survive, employed "improper means" or acted for an "improper purpose" to eliminate plaintiffs' hospital, Douglas County Medical Center (DCMC), as a competitor and that a jury could find that Mercy's conduct substantially contributed to DCMC's demise in February 2000.

More particularly, plaintiffs' intentional interference claim is predicated on the relationships between and among four primary actors—the two antagonists (DCMC and Mercy), the Roseburg Surgicenter, Inc. (RSCI), and SureCare Health Plans (SureCare). In recounting the material facts, we state those facts, consistently with our standard in reviewing the allowance of a directed verdict, in the light most favorable to the nonmoving party, here, plaintiffs. *See Hudjohn v. S&G Machinery Co.*, 200 Or App 340, 342, 114 P3d 1141 (2005).

In this case, even more than most, the adage is apt: "You can't tell the players without a scorecard." The relationships between and among various "players" in the Douglas County healthcare community were close, overlapping, and often tangled—and, indeed, that dynamic permeates plaintiffs' intentional interference allegations. Accordingly, it is not merely useful, but imperative, to clearly identify the four primary actors at the outset:

- *DCMC*. DCMC (or its predecessors) operated an acute care hospital in Roseburg from the 1950s until February 2000.

- *Mercy*. Mercy also operated an acute care hospital in Roseburg for many years, and that hospital continued to be in business as of the time of the trial in 2002.

- *RSCI*. RSCI was a corporation engaged in the operation of the Roseburg Surgicenter, an outpatient surgery facility. Most of RSCI's shareholders were Roseburg physicians who performed outpatient surgeries at the Roseburg Surgicenter facility. Beginning in 1991, a partnership consisting of RSCI, as 75 percent general partner, and DCMC's principals, as 25 percent limited partners, operated the Roseburg Surgicenter.

- *SureCare*. SureCare was a health insurance provider that was owned by the Douglas County Individual Practice Association, a group of local physicians. SureCare provided benefits to Douglas County members of the Oregon Health Plan (OHP) and, in that capacity, solicited bids and entered into contracts with healthcare providers for the provision of such services. In addition, SureCare provided health insurance benefits to private parties, including Mercy—that is, SureCare was the healthcare insurance provider for Mercy's employees.

For many years, DCMC and Mercy were "very strong competitors." However, because Roseburg was not sufficiently large, neither was operating at full capacity, and meaningful expansion of one could come only to the other's detriment. By the mid-1990s, Mercy had increased its market share in the inpatient care market to approximately 80 percent, and DCMC's share had correspondingly declined.

At the same time, both DCMC and Mercy had identified the increased participation in outpatient surgical

care—and, particularly, a closer relationship with RSCI and its physician shareholders—as "pivotal" to DCMC's competitive success, and even survival. Mercy determined that, if it could persuade the Roseburg Surgicenter doctors to associate with it, and not with DCMC, it would be able to force DCMC "to close its facility" and "vacate the community." For its part, RSCI was also concerned that it needed to have closer business relationships with one or both of the hospitals in order to ensure that it would be able to provide outpatient surgery services to managed care patients.

In 1997, Mercy proposed that RSCI, in cooperation with DCMC, join with Mercy to operate a new surgery center to be located on Mercy's campus. RSCI did not accept that proposal.[1] In 1998, DCMC announced that it intended to undertake a substantial renovation and expansion of its existing complex, including development of a new medical office complex. DCMC viewed the Surgicenter doctors' use of DCMC facilities, including the expanded facilities, as being critical to its continued survival in the community. Mercy, in response, continued to pursue its efforts to relocate the Surgicenter physicians' practices to the Mercy campus.

DCMC's and Mercy's conflict was not limited to courting the Surgicenter and the physician shareholders of RSCI. At the same time, in early 1998, DCMC and Mercy were competing to provide medical services to OHP members in Douglas County. Before 1998, SureCare had contracted with a number of care providers, including both Mercy and DCMC, to provide medical services to OHP members. However, in 1998, SureCare sought to enter into an exclusive contract with a single provider for hospital services for OHP patients.

In soliciting bids, SureCare communicated to both DCMC and Mercy that it had only $28 per member per month (PMPM) to spend on those medical services.[2] In

---

[1] The Roseburg Surgicenter was located at a site that was not part of either the DCMC campus or the Mercy campus.

[2] Appellants' opening brief offers the following cogent explanation for the operation of a "capitated" arrangement between an insurer and a healthcare provider:

"Under a 'capitated' plan such as SureCare's OHP plan, an insurer contracts to pay a hospital a fixed amount per month for every member of the health plan—

response to that solicitation, DCMC submitted a bid of $48 PMPM—that is, $20 in excess of the figure identified in SureCare's solicitation. Conversely, Mercy submitted a bid of $28 PMPM, although it knew that the cost of the services to be provided would almost certainly exceed that amount. In addition, Mercy agreed not to pursue a claim against Sure-Care for additional payment for services rendered to OHP patients in 1997, in the amount of $400,000. SureCare awarded the exclusive OHP contract to Mercy, effective April 1, 1998. Around the same time, Mercy made a $250,000 payment to SureCare.

Our analysis of the principal issue on appeal, *viz.*, the legal sufficiency of DCMC's proof of Mercy's use of allegedly "improper means," turns largely on the circumstances of Mercy's agreement not to pursue the alleged $400,000 "debt" and of Mercy's $250,000 payment to SureCare. Accordingly, we recount those circumstances in some detail.

Throughout 1997, Mercy provided services to OHP patients. SureCare reimbursed Mercy for those services at the rate set in a contract for services in 1996; Mercy and SureCare did not enter into a new contract for services to be provided in 1997. In November 1997, Mercy noted in a letter to SureCare that "we need to discuss and agree upon an acceptable capitation rate for the 1997 contract year." Mercy then proposed that the $28 PMPM proposed for the 1998 contract year would be "the rate that we require as the minimum payment for 1997." In January 1998, in response to Sure-Care's solicitation of bids for provision of 1998 services, Mercy proposed, as part of its bid that:

> "[I]n a gesture of good faith, [Mercy is] willing to call it 'even' when considering our open account for 1997. To reiterate, Mercy has gone through the 1997 year without a contract. That means we were paid 1996 rates for the entire year of 1997. It has been previously agreed that we would settle up on a final rate for 1997. As an additional token of

a payment 'per capita,' whether or not any member receives treatment * * *. Thus, if there were 10,000 members in the Douglas County OHP program, a capitated contract rate of $50 per member per month ('PMPM'), would require SureCare to pay a medical provider $500,000 per month in return for the provider's agreement to treat any of the 10,000 OHP plan members who sought treatment during the term of the contract."

our ongoing commitment to DCIPA [Douglas County Individual Practice Association] and SureCare, [Mercy] will accept as payment in full, whatever Mercy has already collected, or is in the process of collecting, for 1997."

The circumstances of Mercy's $250,000 payment and the ultimate use of some part of those monies are even more arcane, but are central to plaintiffs' contentions.[3] SureCare, as an insurer, was required by state law to maintain sufficient reserves to pay claims. However, in early 1998, the Department of Consumer and Business Services (DCBS) determined that SureCare's reserves were too low. SureCare, in danger of being closed down by regulators, approached both Mercy and DCMC seeking funds to bolster its inadequate reserves. In late March 1998, Mercy provided the funds by way of a $250,000 payment to SureCare. At that time, Mercy and SureCare had reached agreement on the 1998 OHP contract and, concomitantly, Mercy knew that, if regulators shut down SureCare, that agreement would be in jeopardy.

Shortly after that payment was made, DCBS sought confirmation that the $250,000 was, in fact, a donation rather than a loan or some other payment for which Mercy would later seek repayment in some form. Aware of DCBS's concerns, on April 2, 1998, Mercy's chief financial officer, Baker, sent a letter to SureCare, which she knew would be provided to DCBS, stating that Mercy's payment had been for "future IBNR [incurred but not yet reported] refund March capitation payment" on SureCare's coverage of Mercy's employees and that Mercy *agrees not to ask for repayment of that check now or in the future.*"[4] (Emphasis added.) DCBS relied on that statement and characterized the $250,000 payment as a donation, raising SureCare's reserves to the requisite level.

---

[3] To avoid confusion, the following description, while stated in accordance with our standard of review, is somewhat simplified.

[4] Even upon a careful reading of the record, the "IBNR" reference is inscrutable. We do not understand Mercy to defend that characterization of the purpose of the $250,000 payment. In all events, given Baker's later, contradictory characterization of the payment (described below), a trier of fact could find the "IBNR" explanation to have been a misrepresentation to DCBS regulators.

Mercy and SureCare later altered their characterization of the $250,000 payment. Instead of the "future IBNR refund" characterization, Mercy styled the $250,000 payment as having been given in consideration for SureCare's agreement to waive "early termination rights" under the agreement by which SureCare provided health insurance benefits to Mercy's employees. In response to further inquiries by DCBS, SureCare gave the following explanation:

> "Mercy Medical Center made a 'no strings attached' donation of $250,000 to SureCare Health Plans. At the time of the donation, there was nothing given or implied to be given in exchange for this donation.

> "In April, it was found that a non-profit organization cannot give monies to a for-profit organization because of antitrust and [related] issues. Due to this, SureCare then entered into an agreement to waive its right of termination of the Group Health Plan Agreement with Mercy Medical Center. This was completed by the first of May, but made retroactive to the date of the donation."

Thus, as subsequently styled by both Mercy and SureCare, the $250,000 payment did not, in fact, prove to be a "'no strings attached' donation." Rather, SureCare ultimately gave consideration for that payment. Nevertheless, DCBS apparently accepted the latter-day characterization of the $250,000 payment and does not appear to have initiated any action against SureCare based on that payment or on the varying representations regarding that payment.

That did not, however, conclude the matter of the $250,000 payment; one last twist remained. Because of the exclusive nature of Mercy's OHP contract with SureCare, other healthcare providers, including Surgicenter, had been excluded from providing surgical services to OHP patients. In the fall of 1998, Mercy, SureCare, and RSCI entered into an agreement by which Mercy agreed to a "carve out" arrangement. Under that "carve out," Mercy subcontracted with the Surgicenter for the Surgicenter to provide certain outpatient surgery services to OHP patients. Mercy funded that subcontract arrangement, in part, with what was, in effect, a $150,000 refund from SureCare of Mercy's original $250,000 payment. That is, SureCare effectively returned to Mercy

$150,000 of Mercy's original $250,000 payment, and Mercy, in turn, applied those monies to fund the "carve out."

That "carve out," with the concomitant expansion of business for RSCI's physician shareholders, did not occur in isolation. Rather, contemporaneously with the "carve out," Mercy continued in its efforts to induce RSCI and its shareholders to relocate the Surgicenter to Mercy's campus. Plaintiffs, despite their limited partnership with RSCI, were not included in the negotiations between Mercy and RSCI regarding the relocation of the Surgicenter.

Ultimately, in December 1998, Mercy and RSCI reached a tentative agreement that Mercy would enter into a joint venture with both Surgicenter partners (RSCI and DCMC's principals) to locate the Surgicenter at Mercy. When DCMC learned of that proposal, it refused to agree to it. Thereafter, in April 1999, Mercy leased the space where the Surgicenter was then located. RSCI then told DCMC that the Surgicenter would have to be relocated because that space had been leased to another party.

At that point, in the summer of 1999, with no chance of bringing a surgery center to DCMC and little support from local doctors, DCMC abandoned its expansion plans. In February 2000, DCMC ceased operating. The Surgicenter did not, in fact, ultimately relocate to Mercy.

Plaintiffs initiated this action against Mercy and RSCI alleging, as relevant here, that Mercy had intentionally interfered with DCMC's business relationship with RSCI and its doctors. The case was tried to a jury over 15 days in March and April 2002. At the close of evidence, Mercy moved for a directed verdict on the claim for intentional interference with economic relations, arguing that plaintiffs had presented no evidence of "improper means" or "improper purpose," and further arguing that no evidence supported a conclusion that Mercy had caused DCMC to lose business and, ultimately, to cease operations. The trial court granted the motion, expressing its view that plaintiffs' evidence that Mercy's actions had caused DCMC's closure was inadequate:

"Mercy had some time ago chosen the path to upgrade, modernize and it may have been perceived by [DCMC] as a conspiracy between Mercy and the Surgery Center and so forth to do them in *but it's just as likely and in my opinion more likely* that this was done just in the ordinary course of business and that [DCMC] had lost its capacity to respond to a challenge."

(Emphasis added.)

■ On appeal, plaintiffs assert that the trial court's expressed rationale "cannot be reconciled with the proper standard" governing the allowance of motions for directed verdict. In particular, the trial court's reliance on its own weighing of the evidence was erroneous. We agree.

■ In *Bolt v. Influence, Inc.*, 333 Or 572, 578, 43 P3d 425 (2002), the court recapitulated the controlling standard:

"Consistent with those earlier cases, this court has held more recently that 'the jury must be permitted to consider every claim on which the plaintiff has presented *some* evidence tending to establish each element of that claim.' *State v. Brown*, 306 Or 599, 602, 761 P2d 1300 (1988) (emphasis in original). In other words, '[o]nly when there is no evidence to support an element may the claim be withdrawn from the jury's consideration.' *Id.* at 603. Moreover, this court consistently has held that, when deciding a motion for directed verdict, a court must not weigh the evidence. Rather, the court must consider all the evidence, including reasonable inferences drawn therefrom, in the light most favorable to the party opposing the motion. *See, e.g., Wootten v. Dillard*, 286 Or 129, 136, 592 P2d 1021 (1979) (explaining standard)."

(Footnote omitted; emphasis in original.) Here, the trial court's assessment that it was "just as likely and in my opinion more likely" that Mercy's actions had not caused plaintiffs' damages involved precisely the sort of weighing of evidence proscribed under *Bolt* and its antecedents. Rather than determining whether plaintiffs had adduced "*some* evidence tending to establish each element" of the intentional interference claim, *Brown*, 306 Or at 602, the court determined that Mercy had presented *more persuasive* evidence on the question of causation. In that regard, the trial court erred.

■       That error does not, however, necessarily compel reversal, because Mercy urges an alternative basis for affirmance of the directed verdict. In particular, as before the trial court, Mercy contends that plaintiffs failed to present legally sufficient evidence that Mercy acted either with an "improper purpose" or through "improper means." We turn, then, to that alternative contention.

■       A claim for intentional interference with economic relations requires proof of six elements:

> "(1) the existence of a professional or business relationship (which could include, *e.g.*, a contract or a prospective economic advantage), (2) intentional interference with that relationship, (3) by a third party, (4) accomplished through improper means or for an improper purpose, (5) a causal effect between the interference and damage to the economic relationship, and (6) damages."

*McGanty v. Staudenraus*, 321 Or 532, 535, 901 P2d 841 (1995). Here, the *prima facie* sufficiency of plaintiffs' proof of the first three elements is not at issue—that is, DCMC had business relationships with RSCI and the Surgicenter doctors, and Mercy, a third party, intentionally interfered with those relationships. As discussed previously, a jury question exists as to the final two elements—*viz.*, whether Mercy's acts actually injured DCMC's economic relationship with third parties and the extent, if any, of plaintiffs' consequent damages. Thus, our inquiry reduces to whether plaintiffs produced any evidence that Mercy's interference was accomplished for an "improper purpose" or through "improper means."

"Improper purpose" in interference with economic relations cases (sometimes referred to as "improper motive") is analyzed under Oregon law by reference to certain provisions of the *Restatement (Second) of Torts* (1974). *See, e.g., Uptown Heights Associates v. Seafirst Corp.*, 320 Or 638, 653, 891 P2d 639 (1995) (referring to *Restatement* at § 766); *Top Service Body Shop v. Allstate Ins. Co.*, 283 Or 201, 206-10, 582 P2d 1365 (1978) (referring to section 766 of the original *Restatement of Torts* (1939) as well as to sections 766, 776B, and 767 of the tentative draft of the *Restatement (Second)*

concerning "improper motives" and "improper means").[5] While *Restatement* section 766 generally describes the components of the tort, section 768 specifically concerns intentional interference with business relations when the parties are business competitors. Section 768(1) provides:

"One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if

"(a) the relation concerns a matter involved in the competition between the actor and the other and

"(b) the actor does not employ wrongful means and

"(c) his action does not create or continue an unlawful restraint of trade and

"*(d) his purpose is at least in part to advance his interest in competing with the other.*"

(Emphasis added.) Comment g to section 768 amplifies subsection (d):

"The rule stated in this Section developed to advance the actor's competitive interest and the supposed social benefits arising from it. *If his conduct is directed, at least in part, to that end, the fact that he is also motivated by other impulses, as, for example, hatred or a desire for revenge is not alone sufficient to make his interference improper.* But if his conduct is directed solely to the satisfaction of his spite or ill will and not at all to the advancement of his competitive interests over the person harmed, his interference is held to be improper."

(Emphasis added.)

In this case, plaintiffs point to their proof of Mercy's declared objective that DCMC close its hospital in Roseburg, *see* 203 Or App at 624, and contend that, from that evidence,

---

[5] *See also North Pacific Lbr. v. Moore*, 275 Or 359, 369, 551 P2d 431 (1976) (referring to original *Restatement* § 768(1) concerning "improper interference" between business competitors); *Ron Tonkin Gran Turismo v. Wakehouse Motors*, 46 Or App 199, 211, 611 P2d 658, *rev den*, 289 Or 373 (1980) (relying on similar provisions of *Restatement (Second) of Torts* § 768 (1974)).

the jury could have found that Mercy acted with an "improper purpose." Plaintiffs particularly invoke *Top Service Body Shop*, in which the court observed that, if the defendant had acted with the "sole design of injuring Plaintiff and destroying his business," that would be sufficient to prove "improper motive." 283 Or at 210. Plaintiffs' reliance on *Top Service Body Shop* in that regard is misplaced for at least two reasons.

First, the plaintiff and the defendant in *Top Service Body Shop* were not competitors; thus, the court had no occasion to consider the application of *Restatement (Second) of Torts* § 768(1)(d).[6] Second, although the court in *Top Service Body Shop* did note that the plaintiff's *pleading* was sufficient to allege "improper motive," 283 Or at 210-11, it went on to hold that the plaintiff had not adduced *evidence* of improper motive sufficient to avoid a judgment notwithstanding the verdict. *Id.* at 212. In particular, the court concluded that, although the plaintiff had presented evidence of alleged acts of interference, "these acts were wholly consistent with [the defendant's] pursuit of its own business purposes as it saw them and did not suffice to support an inference of the alleged improper motive to injure [the plaintiff]." *Id.* at 212. Thus, the court viewed the defendant's conduct, which was "wholly consistent with [the defendant's] pursuit of its own business purposes," as being insufficient to support an inference that the defendant had acted from an improper purpose.

In this case, DCMC and Mercy were, of course, competitors and had been competing for years. Further, plaintiffs adduced no evidence, even circumstantial evidence, that would have permitted the jury to infer that Mercy's conduct was motivated by any purpose other than a competitive purpose—much less that Mercy acted *solely* from such an improper noncompetitive purpose, *e.g.*, "the satisfaction of [Mercy's] spite or ill will." *Restatement* at § 768 comment g.

---

[6] In *Top Service Body Shop*, the plaintiff was an auto body repair shop, and the defendant was an insurer. The gravamen of the plaintiff's tortious interference claim was that the defendant had engaged in practices directing third parties (insurance claimants) to other body shops. 283 Or at 203.

That is, even viewing the evidence most favorably to plaintiffs, a reasonable juror could reach only one conclusion: Mercy's actions were motivated "at least in part to advance [its] interests in competing with" DCMC. *Restatement* at § 768(1)(d); *accord Ron Tonkin Gran Turismo v. Wakehouse Motors*, 46 Or App 199, 211, 611 P2d 658, *rev den*, 289 Or 373 (1980) (endorsing and applying analysis of *Restatement* at § 768 comment g).[7] Thus, plaintiffs' proof of "improper purpose" was deficient as a matter of law.

■     Our inquiry thus narrows, finally, still further: Did plaintiffs adduce evidence from which the jury could have found that Mercy, "through improper means," intentionally interfered with existing or prospective business relationships between DCMC and RSCI or the Surgicenter doctors?

■     In *Top Service Body Shop*, the court outlined the contours of "improper means":

"[Improper means] may be wrongful by reason of a statute or other regulation, or a recognized rule of common law,[11] or perhaps an established standard of a trade or profession. * * *

---

"[11] Commonly included among improper means are violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehood. *See* Fleming, [*The Law of Torts* 612-14 (4th ed 1971)], Prosser, [*Handbook of the Law of Torts* § 129 at 936-37 (4th ed 1971)], *Restatement (Second) of Torts* § 766, Comments *j, k,* § 767, Comment *c* (Tent. Draft No. 23, 1977). As the latter comment points out, in a claim of improper interference with plaintiff's contractual relations, it is not necessary to prove all the elements of liability for

---

[7] Plaintiffs' reliance on *Aylett v. Universal Frozen Foods Co.*, 124 Or App 146, 861 P2d 375 (1993), is misplaced. In *Aylett*, the defendant, a potato processor, rejected the plaintiff's potatoes but would not release its right of first refusal when another potato processor wanted to buy those potatoes, and did so in order to retaliate against the other potato processor. We held that, although it might be inferred from the evidence that the defendant was pursuing legitimate business purposes, there also was evidence—*e.g.*, the defendant's admission that certain actions had been undertaken for the purpose of retaliating against the plaintiff—from which a jury could find that the motive was solely retaliatory. *Id.* at 153.

another tort if those elements that pertain to the defendant's conduct are present. For instance, fraudulent misrepresentations made to a third party are improper means of interference with plaintiff's contractual relations whether or not the third party can show reliance injurious to himself."

283 Or at 209-10, 210 n 11.

"Improper means" must be independently wrongful by reason of statutory or common law, and include "violence, threats, intimidation, deceit, misrepresentation, bribery, unfounded litigation, defamation and disparaging falsehood." *Conklin v. Karban Rock, Inc.*, 94 Or App 593, 601, 767 P2d 444, *rev den*, 307 Or 719 (1989). That is, the means must be wrongful in some manner other than simply causing the damages claimed as a result of the conduct. *Id.*

Plaintiffs alleged that Mercy engaged in actionable "improper means" in 11 particulars. A comprehensive and exhaustive discussion of the substance, and ultimate deficiency, of each of those specifications would be of no benefit to the bench or bar. Accordingly, we address only two of those specifications—the two that plaintiffs most emphasize on appeal—*viz.*, Mercy's alleged "forgiveness" of SureCare's $400,000 "debt" and Mercy's alleged misrepresentations regarding the $250,000 payment to SureCare. We determine, without further discussion, that Mercy was entitled to a directed verdict as to plaintiffs' remaining specifications of "improper means."

We begin with Mercy's agreement, given in the context of seeking the exclusive OHP contract from SureCare, not to pursue recovery of approximately $400,000 from SureCare as an additional payment for previously rendered services. Plaintiffs suggest that that agreement violated 42 USC section 1320a-7b, which provides criminal penalties for paying remuneration, including kickbacks, bribes, or rebates, to induce another to furnish "any item or service for which payment may be made in whole or in part under a Federal healthcare program[.]"

Plaintiffs' position is untenable for either of two reasons. First, it does not appear that plaintiffs invoked 42 USC section 1320a-7b before the trial court. More particularly,

plaintiffs did not advance any cogent argument that the resolution of a disputed matter constituted the sort of "remuneration" prohibited under 42 USC section 1320a-7b. As noted, 203 Or App at 625-26, although Mercy had been seeking additional payment for services for which SureCare had already paid, there was no evidence that SureCare was, in fact, legally obligated to pay the disputed additional amount.

Second, and more fundamentally, plaintiffs did not, and could not, establish the requisite nexus between the alleged "improper means" (the $400,000 "debt forgiveness") and the alleged actionable interference (interference with the relationships between DCMC and RSCI and the physicians associated with RSCI and the Roseburg Surgicenter). That is a matter distinct from *causation of damages*, the fifth element of the tort, which focuses on the relationship "between *the interference* and damage to the economic relationship." *See McGanty*, 321 Or at 535 (emphasis added). Rather, it pertains to the antecedent fourth element—intentional interference with the relationship "*accomplished through* improper means." *Id.* (emphasis added). That is, the fourth element prescribes a nexus between the "improper means" (or "improper purpose") and the interference with the business relationship, but the fifth element requires a causal nexus between the interference and damage to the relationship.

In elucidating, and applying, that distinction, it is critical to identify the gravamen of plaintiffs' pleadings and proof with respect to the $400,000 "debt forgiveness." Plaintiffs did *not* contend that Mercy employed the "debt forgiveness" as an "improper means" of interfering with any existing, or prospective, relationship between *DCMC* and *SureCare*. In particular, plaintiffs did not contend that, but for the "debt forgiveness," DCMC, not Mercy, would have obtained the exclusive 1998 OHP contract.[8] Rather, plaintiffs contended that Mercy interfered in the relationship between *DCMC* and *RSCI and the Surgicenter doctors.*

---

[8] Paragraph 47 of plaintiffs' operative fourth amended complaint identifies various "protectible business relationships" for purposes of the intentional interference claim, but does not include any reference to SureCare. Given the disparities in the parties' bids for the exclusive OHP contract and the $20 PMPM difference between DCMC's bid and the $28 PMPM figure identified in SureCare's bid solicitation, it is unsurprising that plaintiffs did not pursue such a claim.

In particular, plaintiffs' theory of liability was as follows: (1) Mercy obtained the exclusive OHP contract from SureCare in part because of the "wrongful" $400,000 "debt forgiveness." (2) Because of the exclusive OHP contract, Mercy was able, by way of the "carve out" arrangement, to subcontract OHP outpatient surgeries to the Surgicenter. (3) Because of the "carve out," Mercy was able to induce RSCI and the Surgicenter doctors to violate their obligations to DCMC and to elect to relocate to Mercy's campus rather than to the projected expanded DCMC complex. In sum, with respect to the $400,000 "debt forgiveness," plaintiffs' theory of liability was not that Mercy directly used "improper means"—*e.g.*, coercion, fraud, defamation, etc.—to interfere with the relationships between DCMC and RSCI and the Surgicenter doctors. Rather, plaintiffs' theory was that Mercy used the fruits of prior improper conduct in order to subsequently interfere with a competitor's relationships with its partner and existing or prospective "customers."

That relationship between "improper means" and the alleged interference is too attenuated to constitute actionable tortious interference. As noted, a plaintiff claiming intentional interference with economic relations must prove intentional interference with a business relationship with a third party that is *accomplished through* improper means[.]" *McGanty*, 321 Or at 535 (emphasis added). The words "accomplished through" indicate the necessity of a direct connection between the "interference" and the "improper means." That construct does not encompass the circumstance in which a party engages in improper conduct to obtain resources from a third party that it later uses to compete for business.

Here, the alleged interfering conduct was Mercy's subcontracting of OHP work to the Surgicenter doctors by way of the "carve out." The alleged "improper means" was Mercy's agreement, in obtaining the OHP contract months earlier, to "forgive" SureCare's "debt." Thus, the "improper means" was several steps removed from the alleged "interference" with the relationship between DCMC and RSCI and the Surgicenter doctors.

The circumstances here are analogous to a situation in which a business owner embezzles funds from his grandmother and uses those funds several months later to wine and dine a competitor's customers away from the competitor: Although embezzlement is certainly "improper," using embezzled funds to later wine and dine a competitor's customers does not transform the wining and dining into actionable "improper means" of obtaining customers. Although the interference would not have occurred but for the prior improper conduct, the actual act of interference was not itself improper. Accordingly, the alleged $400,000 "debt forgiveness" did not constitute actionable "improper means"; nor did it transform the later "carve out" into "improper means."

Plaintiffs' reliance on Mercy's alleged misrepresentations to regulators regarding the $250,000 payment to SureCare fails for similar reasons. Plaintiffs appear to reason as follows: (1) Mercy's varying direct and indirect representations to regulators regarding the character of the $250,000 payment were intentionally false and calculated to mislead regulators. (2) But for those alleged misrepresentations, DCBS would have required SureCare to cease operations because of inadequate reserves. (3) If that had occurred, Mercy would have risked losing the exclusive OHP contract and, thus, might not have had the OHP business to subcontract out to the Surgicenter doctors by way of the "carve out." (4) In a related sense, Mercy applied a partial refund of the purported $250,000 "donation" to finance the "carve out" arrangement. (5) Without the inducement of the "carve out," RSCI would not have violated its obligations to plaintiffs and the Surgicenter doctors would not have opted to relocate to the Mercy complex rather than to the putative expanded DCMC complex.[9] Thus, the substance of plaintiffs' position is that, but for Mercy's improper conduct in misrepresenting the character of the $250,000 payment, the "carve out," with its attendant interference, would never have occurred.

---

[9] At trial, plaintiffs abandoned their contention that the $250,000 payment itself was somehow improper and caused SureCare to award the exclusive OHP contract to Mercy. However, plaintiffs did not abandon their contention that Mercy had misrepresented to government agencies "the nature of the $250,000 payment to SureCare and * * * that the money was not to be repaid."

Again, the requisite nexus was absent. As with the $400,000 "loan forgiveness" and the "embezzling business owner" hypothetical set out above, "improper means" refers to the actual acts of interference and not to antecedent conduct, involving third parties, that facilitated those acts. As with the "loan forgiveness," Mercy's alleged improper conduct in misrepresenting to regulators the character of the $250,000 payment may well have permitted Mercy to obtain, or retain, the exclusive OHP contract without which Mercy could never have engaged in the interfering conduct, *viz.*, the "carve out" arrangement with the Surgicenter doctors.[10] But again, as with the "loan forgiveness" specification, that is not enough. Where the actual acts of interference were not themselves improper, a defendant's antecedent conduct, however wrongful or unlawful, cannot constitute actionable "improper means."

In sum, although we agree with plaintiffs that the trial court's stated reason for granting the directed verdict was erroneous, the result nonetheless was correct because plaintiffs failed to adduce sufficient evidence to present a jury question as to either "improper purpose" or "improper means."

Affirmed on plaintiffs' appeal; affirmed on defendants' appeal from supplemental judgment denying attorney fees.

---

[10] A second hypothetical, somewhat similar to our first, is illustrative: Rather than embezzling funds and then using that money to entertain the competitor's customers, the business owner, upon hearing that the customers' favorite restaurant is insolvent, conspires with the restaurant's owners to defraud their creditors so that the restaurant can remain open. But for that improper conduct, the restaurant would have closed and the business owner would not have been able to engage in the act of interference, *viz.*, entertaining the competitor's customers at the restaurant.