Argued and submitted June 9, 2015; reversed and remanded on appeal, affirmed on cross-appeal December 21, 2016; petition for review denied April 13, 2017 (361 Or 350)

Jay S. GRIMSTAD,
Karen J. Grimstad, and
Paul N. Grimstad,
*Plaintiffs-Respondents,*
*Cross-Appellants,*

*v.*

Bruce A. KNUDSEN
and Robert G. Knudsen,
*Defendants-Appellants,*
*Cross-Respondents.*

Washington County Circuit Court
C113324CV;
A154574 (Control), A152322

386 P3d 649

Eli D. Stutsman argued the cause and filed the briefs for appellants-cross-respondents.

Richard L. Grant and Bob Casey argued the cause for respondents-cross-appellants. With them on the joint briefs was Richard L. Grant, P.C.

Before Sercombe, Presiding Judge, and Hadlock, Chief Judge, and Tookey, Judge.

### SERCOMBE, P. J.

This case is a dispute over the proceeds from a sale of real property. The property in question, a house in Durham, Oregon (the Durham property), was once owned by Madeline Grimstad and her husband, Neal Grimstad. Through a codicil to her will (the second codicil), Madeline left the Durham property to plaintiffs—her stepchildren and Neal's biological children—if Neal predeceased her, and if she owned the property at the time of her death. The second codicil was the only specific devise in Madeline's will, and defendants—Madeline's biological children—were the residuary devisees under the will. Madeline also designated defendants as her attorneys-in-fact, which placed them in charge of her care and her financial affairs after she was diagnosed with Alzheimer's disease and became incompetent.

Using the power of attorney, defendants sold the Durham property and used the proceeds to pay for Madeline's Alzheimer's care. Plaintiffs brought an action, raising claims for intentional interference with prospective economic advantage,[1] accounting, and constructive trust, asserting that defendants had interfered with their inheritance by selling the Durham property and using the proceeds from the sale for her care, instead of using other assets that Madeline owned. On defendants' motion for summary judgment, the trial court dismissed those claims. However, the court also granted plaintiffs' motion for leave to amend their complaint. Plaintiffs filed an amended complaint, raising claims of unjust enrichment and money had and received. The court subsequently rejected several dispositive motions by defendants, and, after a bench trial, granted relief to plaintiffs on both of their claims.

Defendants appeal, raising seven assignments of error, and plaintiffs cross-appeal, raising two. We write to address defendants' sixth assignment of error on appeal,

---

[1] Although plaintiffs refer to their claim as "intentional interference with prospective inheritance," Oregon courts do not recognize that claim as a "separate and distinct claim." *Allen v. Hall*, 328 Or 276, 280, 974 P2d 199 (1999). However, a plaintiff can state a claim for intentional interference with prospective economic advantage based on a defendant's interference with an expectancy of inheritance. *Id.* at 281-82.

asserting that the trial court erred in granting relief to plaintiffs, and plaintiffs' first assignment of error on cross-appeal, arguing that the trial court erred in granting defendants' motion for summary judgment with respect to the intentional interference with prospective economic advantage claim. For the reasons that follow, we conclude that the trial court erred in granting plaintiffs relief for unjust enrichment and money had and received, and that the trial court did not err in granting defendants' motion for summary judgment.[2] We therefore reverse and remand on appeal and affirm on cross-appeal.

## FACTUAL AND PROCEDURAL HISTORY

In reviewing a trial court's determinations following a bench trial, we "review the [trial] court's explicit and implicit findings of fact for any evidence in the record to support them, and the legal consequences of those facts for legal error." *Emrys v. Farmers Ins. Co.*, 275 Or App 691, 693, 365 P3d 1119 (2015) (internal quotation marks omitted); *Wilson v. Gutierrez*, 261 Or App 410, 411, 323 P3d 974 (2014).

When we address plaintiffs' challenge on cross-appeal to the trial court's ruling granting defendants' motion for summary judgment, we view the facts relevant to that claim in the light most favorable to plaintiffs, in accordance with our standard of review for motions for summary judgment. ORCP 47; *Jones v. General Motors Corp.*, 325 Or 404, 408, 939 P2d 608 (1997). We state the facts in accordance with those standards.

---

[2] In addition to the assignments of error that we write to address, the parties raise the following assignments of error: In their first assignment of error, defendants contend that the trial court abused its discretion in granting plaintiffs' motion for leave to amend their complaint. In their second assignment of error, defendants argue that the trial court erred as a matter of law in granting plaintiffs' motion for leave to amend the complaint, asserting that the new claims were legally insufficient. In their third, fourth, and fifth assignments of error, defendants contend that the trial court erred in denying their ORCP 21 A(8) motion to dismiss for failure to state ultimate facts sufficient to constitute claims for relief, ORCP 21 B motion for judgment on the pleadings, and ORCP 60 motion for directed verdict. Finally, in their seventh assignment of error, defendants claim that the trial court erred in admitting certain parol evidence.

In their second assignment of error on cross-appeal, plaintiffs assert that the trial court erred in its calculation of damages.

Our disposition obviates the need to address those remaining assignments of error.

Madeline and Neal Grimstad were married in 1980. Each had substantial assets from a previous marriage. After they were married, Madeline and Neal entered into a post-nuptial agreement, separately providing for the inheritance of their respective biological children. Neal executed a will and two codicils, devising his estate in trust to support Madeline during her life and, after her death, devising the remainder to his three children from his previous marriage, who are plaintiffs in this case. Madeline also executed a will in which she devised her estate, in equal shares, to her two children from her previous marriage, who are defendants in this case.

In 1980, Neal and Madeline purchased the Durham property as joint tenants with rights of survivorship. They lived in the Durham property until 1986, when they moved into a house in Sisters, Oregon, which was solely owned by Madeline. In 1998, Madeline caused the Sisters property to be titled to herself and defendants as tenants in common, and each of them held a one-third interest in the property until Madeline's death.

In June 1991, Madeline executed a power of attorney authorizing defendants to exercise control over her financial affairs on her request or if she became incapacitated. The document provided, in part, that defendants were empowered to make expenditures for Madeline's care and support; to "manage, administer, operate, maintain, improve and control" any of Madeline's property; to "sell, convey, grant, exchange, transfer, option, convert, mortgage, pledge, consign, lease and otherwise dispose of any of [her] property, whether real or personal"; and to "make gifts," including gifts made to themselves. The cover letter to the power of attorney provided that defendants were to exercise their powers "in [Madeline's] behalf and for [her] benefit only" upon her request or upon her incapacitation.

In March 1995, Madeline executed the second codicil to her will. In that document she devised the Durham property as follows:

"If at the time of my death my spouse NEAL K. GRIMSTAD has predeceased me and I own [the Durham

property,] I give it in equal separate shares to the lineal descendants of my husband NEAL K. GRIMSTAD who survive me, by right of representation."

(Capitalization in original.) Madeline subsequently mailed plaintiffs a key to the Durham property, along with a list of Neal's other assets and the locations of his important financial documents.

Madeline and Neal intended for the Durham property to be used for Madeline's care if necessary. To that end, they held the property as joint tenants, with rights of survivorship, ensuring that Madeline would own the property outright if Neal predeceased her. Additionally, Madeline's second codicil, which provided that the property would pass to plaintiffs only if Madeline owned it at the time of her death, ensured that the property would be available to pay for Madeline's care during her life.

In his deposition, Neal's and Madeline's attorney, O'Neil, testified that Madeline wanted the Durham property to go to plaintiffs "if it was still owned by her," that she did not want it to go to defendants, and that she thought "the house may have to be sold for her care if necessary." O'Neil stated that he believed that Madeline intended for the Durham property to be sold only "if it was the last available asset," but that he could only "guess as to Madeline's intent." He also testified that Madeline expected the property to be sold because she "could not pay medical bills with a house."

Additionally, O'Neil, as well as Miller, a financial planner, advised Madeline that she could create a trust to protect plaintiffs' interests in the proceeds from a potential sale of the Durham property. Madeline never created such a trust, however, because, according to O'Neil, she "didn't want to put the burden on [defendants] to take care of her and trace two assets."

Starting in 2003, the parties sought legal advice on the effect of the second codicil. Defendants, who had suspected that Madeline was suffering from dementia starting in 2001, consulted with attorneys about their ability to sell

the Durham property to pay for her future care. Plaintiffs also consulted with attorneys for advice on protecting their inheritance of the Durham property.

Neal died in June 2006, and the Durham property passed to Madeline by right of survivorship. Madeline was subsequently formally diagnosed with Alzheimer's disease, and defendants arranged for her to be moved into a care facility.

Also in June 2006, defendant Bruce Knudsen met with Miller to discuss financial arrangements for Madeline's care. Miller concluded that Madeline's Social Security income, trust income, and rental income from the Durham property would be sufficient to cover Madeline's care expenses as they stood at that time. Defendant told Miller that the Durham property might have to be sold if the cost of Madeline's care increased, but stated that they would set aside for plaintiffs any proceeds from the sale that remained after they paid for Madeline's care. At trial, Miller opined that the cost of Madeline's care would likely have increased to an amount that would have far exceeded Madeline's income if she had lived longer, but he also testified that, based on her 2007 to 2010 tax returns and other information provided by defendants, her income had, in fact, been sufficient to pay for her care without the sale of the home.

In May 2007, defendants sold the Durham property to Day, using the power of attorney, for $363,590.68. Day had known Neal and plaintiffs, and defendant Bruce Knudsen had told her that the proceeds would be used to pay for Madeline's care, with any remaining funds going to plaintiffs on Madeline's death. Day, who was a real estate investor, opined that, at the time she bought the Durham property, the expected rental income from the property was between $1,500 and $1,600 per month.

Defendants transferred the proceeds from the sale into a financial account in Madeline's name (the "Pershing Account"). Defendants sought advice from a financial planner on how to invest the proceeds to keep pace with the increasing costs of Madeline's care.

Prior to the sale of the Durham property, defendants had been paying for Madeline's care personally, in part, because Madeline had not yet received any funds from Neal's trust or pension. Following the sale, defendants paid for all of Madeline's care expenses from the Pershing Account. Defendants also made withdrawals of $23,800.00 from that account to replace "depleted cash," and $17,600.00 for "legal fees and mom's care" to refund the money that they had already spent on her monthly care facility expenses. None of Madeline's Social Security income or funds from Neal's pension or trust were ever used to pay for Madeline's care. That money was deposited into a US Bank account jointly held by defendants and Madeline. Defendants withdrew money from the US Bank account to pay for maintenance and other expenses associated with the Sisters property, which they co-owned with Madeline, while Madeline was still alive.

After Madeline died in May 2010, defendants transferred the remaining sale proceeds from the Pershing Account into a Wells Fargo Bank account that they had held jointly with Madeline.

Plaintiffs subsequently filed a complaint, bringing claims of "intentional interference with prospective inheritance," "accounting," and "constructive trust." Defendants moved for summary judgment on all of plaintiffs' claims, and plaintiffs opposed the summary judgment motion and also sought leave to amend their complaint to add claims for unjust enrichment and money had and received. After a hearing on defendants' motion for summary judgment and plaintiffs' motion for leave to amend, the trial court entered orders granting plaintiffs' motion for leave to amend and then defendants' motion for summary judgment.

The case proceeded on plaintiffs' second amended complaint, which included the unjust enrichment and money had and received claims.[3] In that complaint, plaintiffs

---

[3] Plaintiffs' first amended complaint included two of the claims that the court had previously dismissed on summary judgment. The court dismissed those claims on defendants' ORCP 21 A(8) motion to dismiss for failure to state ultimate facts that constitute a claim, and plaintiffs then filed their second amended complaint including only the unjust enrichment and money had and received claims.

generally alleged, *inter alia*, that Neal and Madeline had considered the Durham property as belonging to Neal and had intended for it to pass to plaintiffs. They further alleged that Madeline had created the second codicil to assure that the property would pass to plaintiffs and that defendants were aware of her intention. Plaintiffs also alleged that "Madeline had income as well as other substantial financial assets available to pay for her care" and, "[d]espite the availability of other income and substantial financial assets," defendants used only the proceeds of the Durham property to pay for Madeline's care.

Additionally, in their final two "general" allegations, plaintiffs claimed:

"24.

"By selling the Durham Property and using only funds traceable to [the] sale of the Durham Property to pay for Madeline E. Grimstad's care and expenses for the last 37 months of her life, [defendants] improperly shifted the cost of Madeline's care and expenses away from assets only they would inherit from Madeline, and exclusively onto an asset which only [plaintiffs] were intended to inherit under the wills and codicils of both Ne[a]l Grimstad and Madeline E. Grimstad.

"25.

"By selling the Durham Property, prior to utilizing, leveraging or selling Madeline Grimstad's other income property and assets, defendants *** intentionally, knowingly or by mistake violated the express intent of Madeline Grimstad's Second Codicil. Under and pursuant to Madeline Grimstad's Second Codicil, following her death, the Durham Property was to be distributed to plaintiffs ***."

Specific to their unjust enrichment claim, plaintiffs made the following additional allegations:

"27.

"In contravention of the marital agreement between Madeline Grimstad and Neal Grimstad, and in violation of the express terms of Madeline Grimstad's estate plan, after the death of Madeline Grimstad, defendants withdrew remaining funds obtained from the sale of the Durham

Property, and distributed them to themselves, and have withheld said funds from [plaintiffs].

"28.

"Defendants have unjustly enriched themselves by obtaining, and withholding from [plaintiffs], and holding for their own benefit funds derived from the breach of their obligation under the provisions of Madeline's Second Codicil. Also they have unjustly enriched themselves by using [the] power of attorney to shift the burden of Madeline's care and expenses away from a residuary devise for their own benefit and onto a specific bequest intended for someone else."

Plaintiffs then requested that the court impose a "constructive trust" over $365,000 "of wealth now generally possessed by the defendants[.]"

As to their money had and received claim, plaintiffs alleged that

"33.

"Defendants hold $85,963.20 that rightfully belongs to plaintiffs.

"34.

"If defendants are not compelled to surrender these funds to [p]laintiffs, they will be unjustly enriched at [p] laintiffs' expense."

Defendants moved to dismiss plaintiffs' claims for unjust enrichment and money had and received under ORCP 21 A(8) for failure to state ultimate facts that constitute claims. Relying on *Winters v. County of Clatsop*, 210 Or App 417, 150 P3d 1104 (2007), defendants argued that plaintiffs had failed to state an unjust enrichment claim, because plaintiffs had not pleaded that they had conferred a benefit on defendants. They further contended that plaintiffs had failed to state a money had and received claim, because plaintiffs had not pleaded that defendants held any money that "rightfully belong[ed]" to plaintiffs.

Relying on *Tupper v. Roan*, 349 Or 211, 243 P3d 50 (2010), plaintiffs responded that they had stated an unjust enrichment claim by putting forward facts from which a

trier of fact could conclude that defendants' actions were "unconscionable." According to plaintiffs, that was the case because defendants sold the Durham property in contravention of Madeline's wishes that the property pass to plaintiffs and used the proceeds from that sale to pay for Madeline's care instead of using Madeline's other assets. Plaintiffs also relied on their allegations that defendants had violated their fiduciary duties to Madeline in the power of attorney. They further argued that they had pleaded a claim for money had and received because defendants were obligated in "equity and good conscience" to turn over the remaining proceeds of the sale to the plaintiffs. In support, they pointed to defendant Bruce Knudsen's alleged statement to Miller that he would reserve for plaintiffs' benefit any proceeds remaining after paying for Madeline's care. The court denied defendants' motion to dismiss.

Defendants reiterated those arguments in their combined motion for judgment on the pleadings and trial memorandum. The court denied defendants' motion for judgment on the pleadings, and the case proceeded to a bench trial. At trial, Miller, Day, plaintiffs, and defendants testified to the facts recounted above.

Defendants moved for a directed verdict, arguing that plaintiffs' claims should be dismissed, again largely reiterating the same arguments discussed above. In response, plaintiffs argued that they had put on evidence that defendants had violated the power of attorney agreement by selling the Durham property in contravention of Madeline's wishes and in order to increase their own inheritance. They contended that it was "hugely inequitable" for defendants to shift the entire burden of paying for Madeline's care onto a property that plaintiffs otherwise would have inherited. Plaintiffs also pointed to evidence that defendants had assured three "neutral part[ies]"—Miller, Day, and Neal's sister, Lindner—that they would save the proceeds of the sale for plaintiffs. The trial court denied defendants' motion for directed verdict.

In their closing argument, plaintiffs contended, again relying on *Tupper*, that defendants were unjustly enriched because their conduct rendered the sale of the

Durham property and their retention of the proceeds of the sale unconscionable. Defendants responded that plaintiffs had not proved their claim, in part, because they had not shown that the sale of the property and retention of the proceeds violated the power of attorney agreement, the second codicil, or any other expression of Madeline's intention. According to defendants, they were not required to turn over the proceeds of the sale of the Durham property to plaintiffs, because Madeline, through defendants, was entitled to sell the property and use the proceeds of the sale for her own benefit.

After taking the case under advisement, the court issued a written opinion and general judgment granting plaintiffs relief on their unjust enrichment claim and, in the alternative, their money had and received claim. In its opinion, the trial court first rejected plaintiffs' claim for the full amount of the Durham property sale proceeds. The court concluded that defendants permissibly sold the property under the power of attorney without first exhausting other assets owned by Madeline that defendants would receive on Madeline's death. The court explained:

> "Plaintiff[s'] argument that monies held in other accounts should have been utilized before using the sale proceeds from the Durham property is unpersuasive. The increase in the monthly amount, or duration of the costs for Madeline's care could only be forecasted to a certain degree. Defendants however, not plaintiffs, were the family members that ultimately were obligated and financially responsible for meeting those care needs—regardless of duration."

On the other hand, the court ruled that defendants had been unjustly enriched by failing to use any assets other than the proceeds from the sale to pay for Madeline's care and by "diverting" Madeline's income to pay for expenses associated with the Sisters property. The court explained its decision as follows:

> "The elements of a quasi-contractual claim of unjust enrichment are (1) a benefit conferred, (2) awareness by the recipient they have received the benefit, and (3) it would be unjust to allow the recipient to retain the benefit without paying for it. *Jaqua v. Nike, Inc.*, 125 Or

App 294 (1993). The evidence is clear defendants were aware that the authority delegated to them through the power of attorney allowed them to sell the Durham property. Defendants were equally aware of their responsibility to use the proceeds from the sale of the Durham property for Madeline Grimstad's care—defendants' statements to the witnesses make that plain. Equally obvious is the conclusion that defendants used the sale proceeds from the Durham property *exclusively* for Madeline Grimstad's care thereby reserving the social security and other trust and pension payments for the maintenance of the Sisters Property. Said differently, defendants depleted the plaintiffs' beneficial interest in the Durham property to enhance their interest in the Sisters Property, which they would eventually inherit.

"Although defendants argue otherwise, the exclusive use of the sales proceeds from the Durham property would not place defendants in any better position to meet any prospective increases in cost of care, either in terms of monthly amount or duration. Instead, by using the sale proceeds from the Durham property to exclusively pay the expenses for * * * Madeline's care, defendants were able to divert social security, trust income and pension income benefits for their immediate use. Moreover, by diverting those sources of income that were lifetime benefits to finance the maintenance and other expenses associated with the Sisters Property, defendants used social security benefits, and other trust and pension income to add value to property they were to inherit."

(Emphasis in original.)

The trial court then awarded plaintiffs $63,242.00 for the "social security payments paid to Madeline Grimstad from June 2006 to May 2010." The trial court did not award plaintiffs the amount of trust or pension income that went into the same US Bank account as the Social Security income— the account from which defendants withdrew money to pay the Sisters property expenses—because "defendants did not begin receiving trust and pension payments until March 2008." The trial court also awarded plaintiffs "$77,710.98 together with 9% interest per annum from May 7, 2010"— the proceeds remaining from the sale of the Durham property at the time of Madeline's death.

## UNJUST ENRICHMENT

On appeal, defendants' primary argument is that plaintiffs did not prove a claim of unjust enrichment because plaintiffs failed to show that they had conferred a benefit on defendants. According to defendants, there are three elements that must be satisfied in an unjust enrichment claim: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant was aware of the benefit; and (3) it would be unjust for the defendant to retain the benefit. They argue that, because the benefit in this case—the proceeds from the Durham property sale and other funds in Madeline's estate not used for her care—did not pass to them from plaintiffs, plaintiffs could not prevail.

Plaintiffs do not dispute that they did not confer a benefit on defendants. Instead, as they did in the trial court, plaintiffs respond that, under the Supreme Court's decision in *Tupper*, they were not required to demonstrate that they conferred a benefit on defendants to prove their claim. Instead, according to plaintiffs, there is no single test for unjust enrichment, and, so long as a plaintiff proves that it would be "unconscionable" for a defendant to retain some benefit, the plaintiff has proved an unjust enrichment claim. For their part, defendants retort that *Tupper* is distinguishable, primarily because plaintiffs lacked a sufficient legal or equitable interest in the Durham property or the proceeds of its sale. To that end, defendants argue, as they did in their closing argument in the trial court, that the second codicil and the power of attorney allowed them to sell the Durham property and to use the proceeds for Madeline's benefit, and that plaintiffs had no right to the property or the proceeds of its sale.

This assignment of error presents two issues: First, whether plaintiffs can prove an unjust enrichment claim without showing that they conferred a benefit on defendants, but instead by showing that defendants received a benefit from a third party, and, second, whether the trial court properly concluded that defendants would be unjustly enriched if they were allowed to retain the benefit at issue in this case.

To start, we have referred to the three elements described by defendants—(1) a benefit conferred on the defendant by the plaintiff; (2) the defendant's awareness of the benefit; and (3) under the circumstances, it would be unjust for the defendant to retain the benefit without compensating the plaintiff—as the "well-established" test for unjust enrichment. *Winters*, 210 Or App at 421. Further, although not all of our unjust enrichment cases expressly state that the benefit must be conferred on the defendant by the plaintiff, most involve allegations that the plaintiff did, in fact, confer a benefit on the defendant. *See, e.g., Larisa's Home Care, LLC v. Nichols-Shields*, 277 Or App 811, 814-15, 372 P3d 595, *rev allowed*, 360 Or 400 (2016) (plaintiff provided adult foster care services to defendant at a reduced rate); *Wilson*, 261 Or App at 416 (counterclaim plaintiff provided counterclaim defendant with money for gambling and other expenses); *Volt Services Group v. Adecco Employment Services*, 178 Or App 121, 124, 134, 35 P3d 329 (2001), *rev den*, 333 Or 567 (2002) (plaintiff placed employees in jobs, allowing defendant to avoid that task when defendant took over plaintiff's contract); *Jaqua v. Nike, Inc.*, 125 Or App 294, 298, 865 P2d 442 (1993) (plaintiff provided defendant with an idea for a new shoe). That test also includes three subelements to determine if the defendant's enrichment would be "unjust":

"'(1) the plaintiff had a reasonable expectation of payment;

"'(2) the defendant should reasonably have expected to pay; or

"'(3) society's reasonable expectations of security of person and property would be defeated by non-payment.'"

*Cron v. Zimmer*, 255 Or App 114, 130, 296 P3d 567 (2013) (quoting *Jaqua*, 125 Or App at 298).

Plaintiffs' view of the claim, however, is also backed by the case law. Indeed, in *Tupper*, the Supreme Court noted that, although its "cases refer to a substantive 'doctrine' of unjust enrichment, none provide any really comprehensive exposition of that doctrine," but they instead "simply describe the kinds of actions and circumstances that would

constitute unjust enrichment * * *." 349 Or at 220. The court further stated that, "[a]mong all of those examples, however, the common thread is the acquisition or retention of property in a way that is in some sense wrongful or * * * 'unconscientious.'" *Id.* (quoting John Norton Pomroy, 4 *A Treatise on Equity Jurisprudence* § 1053, 119 (5th ed 1941)).

*Tupper* involved an unjust enrichment claim by the plaintiff against her deceased ex-husband's girlfriend, the defendant, to establish a constructive trust over a portion of the proceeds of the decedent's life insurance policy, of which the defendant was the sole beneficiary. 349 Or at 213-14. The plaintiff argued that she was entitled to those proceeds because of a clause in the dissolution decree, which required the divorcing parties to each maintain a life insurance policy in the other's name, for the benefit of their children, and provided for the imposition of a constructive trust over the proceeds of any life insurance policy in the name of a party who failed to comply. *Id.* at 215.

After reviewing its past case law, the court explained that, "in circumstances like those presented" in *Tupper*, a plaintiff had to satisfy three elements to prevail on an unjust enrichment claim:

> "First, the plaintiff must show that property or a property interest that rightfully belongs to her was taken or obtained by someone else under circumstances that in some sense were wrongful or inequitable. Next, the plaintiff must show that the person who now possesses the property is not a bona fide purchaser for value and without notice. Finally, the plaintiff must establish, with 'strong, clear and convincing evidence,' that the property in the hands of that person, *i.e.,* the property upon which she seeks to impose a constructive trust, in fact is the very property that rightfully belongs to her, or is a product of or substitute for that property."

*Id.* at 223. The court then concluded that, under the facts presented in that case, the plaintiff could bring a claim for unjust enrichment.[4] *Id.* at 228.

---

[4] The court, however, reversed the trial court's grant of summary judgment for the plaintiff, because it concluded that issues of material fact remained as to whether the defendant was a "bona fide purchaser for value without notice" with respect to the policy. *Tupper*, 349 Or at 227-28.

Ultimately, the differences between the tests described in our case law and in *Tupper* might be more aesthetic than substantive. Fundamentally, as the Supreme Court notes, unjust enrichment claims distill to the issue of the "acquisition or retention" of property under circumstances where injustice would result if the defendant was not forced to return the property to the plaintiff. That is consistent with the version of the test stated in our case law. *Compare Tupper*, 349 Or at 220 ("acquisition or retention" of property by defendant under circumstances where that would be "wrongful or * * * unconscientious" (internal quotation marks omitted)), *with Winters*, 210 Or App at 421 ("[U]nder the circumstances, it would be unjust for the defendant to retain the benefit without paying for it.").

As relevant to this case, however, *Tupper* unavoidably establishes that, in at least some circumstances, a plaintiff can bring an unjust enrichment claim even if the plaintiff did not confer a benefit on the defendant. In that case, a third party—the decedent—conferred a benefit on the defendant by purchasing the life insurance policy and naming the defendant as its beneficiary; the plaintiff was not involved in that transaction and conferred no benefit on the defendant. Other cases lend further support to the existence of "third party" unjust enrichment claims. *See Newton v. Pickell et al.*, 201 Or 225, 230-33, 269 P2d 508 (1954) (concluding that wife could bring an unjust enrichment claim against son where her husband had transferred property to son, in violation of prenuptial agreement with wife); *Cron*, 255 Or App at 116-17 (plaintiffs, who were defendant's siblings, brought an unjust enrichment claim against defendant because defendant had refused to create a trust benefiting plaintiffs, after defendant received mining rights from a third party). Thus, with respect to our first question, we conclude that a plaintiff can state an unjust enrichment claim against a defendant on whom the plaintiff did not confer a benefit.

We turn to the second question—whether the court erred in concluding that plaintiffs proved their unjust enrichment claim. *Tupper* remains the starting point for our analysis. There, in order to prove an unjust enrichment claim

against the third-party defendant, the court concluded that the plaintiff was required to demonstrate, *inter alia*, that the defendant has obtained "property or a property interest that rightfully belong[ed]" to the plaintiff. *Tupper*, 349 Or at 223.

In determining what it means for a benefit to "rightfully belong[]" to an unjust enrichment plaintiff, the *Restatement (Third) of Restitution and Unjust Enrichment* section 48 (2011), which addresses third party unjust enrichment claims, is instructive.[5] The authors of the *Restatement* explain that, "[i]f a third person makes a payment to the defendant to which (as between claimant and defendant) the claimant has a *better legal or equitable right*, the claimant is entitled to restitution from the defendant as necessary to prevent unjust enrichment." *Restatement* § 48 (emphasis added).

Comment i to *Restatement* section 48 further explains that the requirement of "a better legal or equitable right" in that section is "highly restrictive." It imposes an obligation on a plaintiff to demonstrate either "proof of a clear legal entitlement" to the property or an entitlement "drawn from equity jurisprudence" that is "both recognized, and accorded priority over the interest of the defendant, under the law of the jurisdiction." *Id.* That comment continues:

> "Proof merely that the defendant has received a windfall, that the claimant has been ill-treated, and that the third party's payment to the defendant (or the defendant's retention of payment as against the claimant) violates rules of good faith, basic fairness, or common decency, does not suffice to make out a claim in restitution under [section] 48 or any other provision of this Restatement."

*Id.*

Those principles are borne out in *Tupper*, where the plaintiff's equitable right to the life insurance proceeds

---

[5] The Supreme Court has recently referenced other sections of that *Restatement. See Eclectic Investment, LLC v. Patterson*, 357 Or 25, 35, 346 P3d 468, *adh'd to as modified on recons*, 357 Or 327, 354 P3d 678 (2015); *Evergreen West Business Center, LLC v. Emmert*, 354 Or 790, 801, 323 P3d 250 (2014). Additionally, the authors of the *Restatement* favorably discussed *Tupper* in the explanation of an illustration for section 48. *See Restatement* § 48, Reporter's Note to comment g.

arose from the provisions of the dissolution decree. The decree mandated that the decedent maintain a life insurance policy in the plaintiff's favor, and it provided for the imposition of a constructive trust on the proceeds of *any* life insurance policy in his name if he failed to do so. *Tupper*, 349 Or at 226-27. Additionally, the court suggested that the plaintiff might *not* have had an equitable interest in the insurance policy if the dissolution decree, instead of requiring imposition of a constructive trust on "any" life insurance policy that the decedent maintained, had merely required the decedent to purchase "some" life insurance policy for the plaintiff's benefit. *Id.* at 225-27.

Thus, *Tupper*'s conclusion did not depend only on the wrongfulness of the decedent's failure to maintain the policy or any unfairness in allowing the defendant to receive a windfall while the plaintiff received nothing. Rather, the court's conclusion rested on the express language of the dissolution decree, which, by its terms, gave the plaintiff an equitable interest in the policy at issue in the case. *See id.* at 226 (explaining that an obligation in a dissolution decree "to obtain an insurance policy naming an ex-spouse as beneficiary may confer an equitable interest in a later-acquired policy, if the obligation in some fashion clearly identified that policy as one of its objects").[6]

The plaintiffs in *Newton* and *Cron* similarly pointed to clearly defined sources for their rights in the property at issue. In *Newton*, the wife's right to property held by her son was traceable to a prenuptial agreement with her former husband. 201 Or at 227-28. In *Cron*, the plaintiffs' interests in mineral rights held by the defendant originated from an (allegedly) express agreement between the defendant and the third party who conveyed her the mineral rights to hold those rights in her name temporarily in order to set up a trust for the plaintiffs' benefit. 255 Or App at 116-17, 130-31.

Therefore, whether plaintiffs pleaded and proved a claim of unjust enrichment depends on whether plaintiffs

---

[6] The *Tupper* court also discussed, but left open, the issue of whether the plaintiff or the defendant had a better legal or equitable right to the proceeds of the policy, remanding to the trial court to decide whether the defendant was a "good faith purchaser for value without notice" of the policy. 349 Or at 227-28.

had a better "legal or equitable right" to the proceeds of the sale of the Durham property than defendants. To prove their claim, plaintiffs had to show more than abstract unfairness from defendants' retention of the proceeds. Instead, they had to identify, with specificity, the source of their right to the proceeds. For the following reasons, we conclude that plaintiffs failed to show that they have *any* right to those proceeds, much less a better right than defendants. The trial court therefore erred in granting relief on plaintiffs' unjust enrichment claim.

Before turning to that analysis, however, we briefly recap plaintiffs' claim and the scope of the trial court's ruling. In their second amended complaint, plaintiffs alleged that defendants were unjustly enriched for two reasons. They first alleged that

> "[d]efendants have unjustly enriched themselves by obtaining, and withholding from [plaintiffs], and holding for their own benefit funds derived from the breach of their obligations under the provisions of Madeline's Second Codicil."

They next alleged that defendants

> "[a]lso *** have unjustly enriched themselves by using [the] power of attorney to shift the burden of Madeline's care and expenses away from a residuary devise for their own benefit and onto a specific bequest intended for someone else."

Plaintiffs requested that a constructive trust be placed on the full amount of the Durham property sales proceeds, $365,000.

The trial court rejected plaintiffs' claim for the full amount of the proceeds of the sale, concluding that defendants made a proper business decision in choosing to sell the Durham property. The court determined that, when they sold the house, defendants were acting within the power of attorney to satisfy their responsibility to meet Madeline's care needs as they were faced with "increase[s] in the monthly amount, or duration of the costs for Madeline's care [that] could only be forecasted to a certain degree."

However, the trial court concluded that defendants were unjustly enriched because they had improperly used the proceeds of the sale instead of other available assets. The court further concluded that defendants were unjustly enriched because they used some of Madeline's income to pay expenses related to the Sisters property. As the trial court explained:

> "[T]he exclusive use of the sales proceeds from the Durham property would not place defendants in any better position to meet any prospective increases in cost of care ***. Instead, by using the sale proceeds *** to exclusively pay the expenses for Madeline's care, defendants were able to divert social security, trust income and pension income benefits for their immediate use. Moreover, by diverting those sources of income that were lifetime benefits to finance the maintenance and other expenses associated with the Sisters Property, defendants used the social security benefits, and the other trust and pension income to add value to property they were to inherit."

The court awarded plaintiffs $63,242.00 for the Social Security payments that Madeline had received during the time she was in the care facility, concluding that those payments should have instead been used for Madeline's care. The court also awarded plaintiffs $77,710.98 plus interest—the remaining proceeds from the sale of the Durham property.

The trial court erroneously concluded that plaintiffs were entitled to the remaining proceeds from the sale of the Durham property to prevent defendants' unjust enrichment. As discussed above, to prove their unjust enrichment claim, plaintiffs had to prove that they had a legal or equitable right to the proceeds of the sale of the Durham property. To do so, they had to specifically identify a legally recognized source of that right and could not merely rely on contentions that defendants' conduct was "unfair" in the abstract. *See, e.g., Tupper*, 349 Or at 226-27 (plaintiff had rights to proceeds of former husband's life insurance because of a provision of a dissolution decree to that effect). Plaintiffs, however, failed to identify any source—whether an instrument, agreement, or set of circumstances—giving them any rights to the proceeds of the sale.

In defending the allowance of their unjust enrichment claim, plaintiffs rely on actions by Madeline indicating that she wanted plaintiffs to receive the Durham property. They point to Madeline's statements to that effect, her creation of the second codicil, and her decision to mail the key to the property to plaintiffs. They also note the representations made by defendant Bruce Knudsen to third parties— including Day and Miller—that he and his brother would reserve any proceeds that were remaining after paying for Madeline's care and distribute those funds to plaintiffs upon Madeline's death.

Put simply, that evidence did not establish that plaintiffs have a legal or equitable right to the proceeds of the sale. Madeline owned the Durham property outright at the time that it was sold. Defendants, acting on Madeline's behalf, sold the house, placed the proceeds in an account in Madeline's name, and spent the proceeds for Madeline's care. Nothing required Madeline, or anyone acting on her behalf, to preserve any portion of the proceeds for plaintiffs.

Indeed, there is no provision of Madeline's will, the second codicil, the power of attorney agreement, or any other instrument that required that the proceeds from the sale of the Durham property be preserved for plaintiffs' benefit. In fact, the second codicil and the power of attorney both bolstered defendants' rights to sell the Durham property. The second codicil was expressly contingent on Madeline owning the property at the time of her death. The power of attorney explicitly permitted defendants to "sell, convey, grant, exchange, transfer, option, convert, mortgage, pledge, consign, lease and otherwise dispose of" *any* of Madeline's real property.

Furthermore, Madeline's statements that she wanted plaintiffs to receive the property did not impose an obligation on defendants to retain the sale proceeds for plaintiffs' benefit. Indeed, as the trial court found, Madeline expected that the property might be sold for her care, and she considered, but rejected, the creation of a trust to preserve the Durham property or its proceeds for plaintiffs. Nor did Bruce Knudsen's representations that he would retain some of the proceeds for plaintiffs' benefit—which were not communicated to plaintiffs—obligate defendants to hold the proceeds

of the sale in trust for plaintiffs. In fact, those representations were consistent with the provisions of the power of attorney allowing defendants to manage Madeline's financial affairs and to "make gifts" or otherwise transfer any of her assets.

Thus, on the facts determined by the trial court, defendants were not required to hold the Durham property proceeds for plaintiffs' benefit. *Cf. Connall v. Felton*, 225 Or App 266, 270-71, 201 P3d 219, *rev den*, 346 Or 257 (2009) (explaining that a "resulting trust" will be created where the "circumstances * * * give rise to an inference that the person who made [a real estate] transfer does not intend the transferee to take a beneficial interest in the property" but instead to hold it for the benefit of a third party). Instead, Madeline, acting through defendants, sold the property solely for her own benefit and had the right to use and retain all of the proceeds. Rather than tracing their rights in the proceeds to a clearly defined and legally recognized source, plaintiffs seek to divest defendants of a "windfall," relying on the kind of abstract unfairness rejected by the authors of the *Restatement*, *see Restatement* § 48 comment i, and the *Tupper* court. As such, plaintiffs had no right to the proceeds of the sale, and the trial court's contrary conclusion was erroneous.

In addition to the proceeds from the sale, the trial court also awarded plaintiffs a sum of money representing the Social Security payments that Madeline received while she was in the care facility. The trial court explained that plaintiffs were entitled to that money because defendants had engaged in self-dealing by using some of Madeline's Social Security payments and other income to enhance the value of the Sisters property, of which defendants and Madeline each owned one-third shares. That was incorrect.

To start, it is unclear that plaintiffs pleaded an unjust enrichment claim based on that conduct. Plaintiffs' second amended complaint alleges that defendants were unjustly enriched by the sale of the house, the use of the proceeds of the sale to pay for Madeline's care instead of other assets that defendants stood to inherit from the estate, and the retention of the remaining proceeds from the sale after Madeline's

death. There is no allegation in the complaint that defendants were unjustly enriched because they engaged in self dealing, in breach of their fiduciary duties, when they used Madeline's income to improve the Sisters property.

To the extent that plaintiffs advanced that theory at trial, the trial court erred in concluding that defendants were unjustly enriched by spending Madeline's money to improve and maintain the Sisters house. If an agent violates his or her fiduciary duties to a principal, the principal may have an unjust enrichment claim to whatever benefits the agent obtained from the violation of his or her duties to the principal. *See Albino v. Albino*, 279 Or 537, 550, 568 P2d 1344 (1977) ("A constructive trust arises where a person in a fiduciary or confidential relationship acquires or retains property in violation of his duty to the grantor."); *Marston v. Myers et ux*, 217 Or 498, 513-14, 342 P2d 1111 (1959) (concluding that restitution was appropriate to prevent unjust enrichment where plaintiff conveyed land to defendants, with whom she had a confidential relationship, and defendants failed to perform their promise to use the land for plaintiff's benefit); Pomeroy, 4 *A Treatise on Equity Jurisprudence* § 1052 at 116 ("When a * * * fiduciary person, without the knowledge or consent of his beneficiary, * * * uses the trust property for his own benefit, or his own business, and by means of such use obtains additional gains and profits,—in these and all similar cases equity impresses a constructive trust upon the * * * profits and acquisitions so made, for the benefit of the party beneficially entitled.").

Here, however, defendants' fiduciary duties—including any obligation to refrain from self dealing—arose from their relationship with Madeline under the power of attorney. Plaintiffs, on the other hand, were not in a confidential or fiduciary relationship with defendants.[7] Thus, even if defendants violated their fiduciary duties to Madeline by using the funds to improve the Sisters property, it was

---

[7] We note that, depending on the circumstances, confidential relationships can arise between parties with familial relationships. *See Marston*, 217 Or at 513-14 (confidential relationship between brother and sister); *Albino*, 279 Or at 551-52 (confidential relationship between parent and child). Plaintiffs have never argued that there was a confidential relationship between them and the defendants based on their relationship as stepsiblings.

*Madeline's estate,* and not plaintiffs, that had a claim to those funds. Put another way, assuming that defendants were unjustly enriched due to a breach of their fiduciary duties as Madeline's attorneys-in-fact, their enrichment was not at *plaintiffs'* expense. *See Restatement* § 48 comment i (explaining that, where the defendant holds property in which neither party has a "protected legal entitlement, the mere fact the claimant's position is superior to that of the defendant when measured by need, merit, or desert will not support a claim in restitution," and that "[a] legal conclusion to this effect is frequently expressed in the observation that while the defendant may have been unjustly enriched, he has not been enriched at the expense of the claimant").

In sum, plaintiffs had no legal or equitable right to proceeds of the sale of the Durham property or any other assets in Madeline's estate. Therefore, plaintiffs did not prove their unjust enrichment claim, and, accordingly, the trial court erred in granting plaintiffs relief on that claim.

## MONEY HAD AND RECEIVED

The trial court also erred in concluding that plaintiffs were entitled to relief on their money had and received claim. Like their unjust enrichment claim, plaintiffs' money had and received claim required them to prove that defendants held money to which plaintiffs were entitled as a matter of right. *See Belmont International v. American International,* 313 Or 112, 124, 831 P2d 15 (1992) ("'The generally accepted test which determines whether a recovery [for money had and received may be obtained] * * * is whether the defendant, in equity and good conscience, is entitled to retain the money to which the plaintiff asserts claim.'" (Quoting *Smith v. Rubel,* 140 Or 422, 426, 13 P2d 1078 (1932). (Brackets and ellipsis in original.)); *Powell et al. v. Sheets et al.,* 196 Or 682, 700, 251 P2d 108 (1952) (action may be maintained "whenever one has money in his hands belonging to another, which, in equity and good conscience, he ought to pay over to that other"); *C. A. M. Concepts, Inc. v. Gwyn,* 206 Or App 122, 128, 136 P3d 60 (2006) ("Recovery on a theory of money had and received is based on a promise implied by law and on the equitable principle that one who has been unjustly enriched at the expense of another is

required to make restitution."). Thus, for the same reasons discussed above, plaintiffs failed to show that they had any right to the proceeds from the sale of the Durham property, and the trial court erred in granting relief on plaintiffs' claim for money had and received.

## INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

Turning to plaintiffs' cross-appeal, in their first assignment of error, plaintiffs assert that the trial court erred in granting defendants' motion for summary judgment on their intentional interference with prospective economic advantage claim. In evaluating that assignment of error, we review the record in the light most favorable to the nonmoving party to determine whether there are any genuine issues of material fact and whether the moving party is entitled to judgment as a matter of law. ORCP 47 C; *Jones*, 325 Or at 420.

In the trial court, plaintiffs alleged that defendants intentionally interfered with their prospective inheritance by selling the Durham property, which,

"combined with transfer of resulting Sales Proceeds into a bank account held jointly with right of survivorship between Madeline E. Grimstad and [defendants,] constituted tortious interference with economic relations, because of the following factors:

"(a) **Economic relationship**, based on status of [plaintiffs] as specific devisees of the Subject Property under the Will of Madeline E. Grimstad;

"(b) **Intentional act of interference**, based on deliberate execution by [defendants] of the Subject Deed, followed by deliberate transfer of the Sales Proceeds into a financial account which would not be inherited by [plaintiffs] at the death of Madeline E. Grimstad, but instead be inherited by [defendants];

"(c) **Third party behavior**, based on [defendants'] status as signers of the Subject Deed and transferors of the Sales Proceeds, and also based on receipt by [defendants] of the Sales Proceeds from the financial account into which they had been deposited by [defendants];

"(d) **Improper means or purpose**, based on violation by [defendants] of an agent's duty under a power of attorney to refrain from self-dealing and to follow instructions of the principal with regard to the principal's property and estate plan; and

"(e) **Causality between interference and harm to economic relationship**, based on removal of Subject Property and the Sales Proceeds obtained from selling the Subject Property, from the probate estate from which [plaintiffs] were to inherit."

(Boldface in original.)

Those elements are taken from *Allen v. Hall*, 328 Or 276, 974 P2d 199 (1999), where the Supreme Court concluded that a plaintiff could establish a claim for "intentional interference with prospective economic advantage," based on intentional interference by the defendant with the plaintiff's expected inheritance. *Id.* at 281-82. To prove a claim for intentional interference, the plaintiff must establish the following elements:

"(1) the existence of a professional or business relationship (which could include, *e.g.*, a contract or a prospective economic advantage); (2) intentional interference with that relationship or advantage; (3) by a third party; (4) accomplished through improper means or for an improper purpose; (5) a causal effect between the interference and the harm to the relationship or prospective advantage; and (6) damages."

*Id.* at 281. The court explained that, although it is neither a professional nor business relationship, an "expectancy of inherence is an interest that fits by logical extension within the concept underlying the tort of intentional interference with prospective economic advantage and, absent some legitimate reason for excluding it, may be deemed to be covered by that theory of recovery." *Id.* at 282.

Defendants moved for summary judgment on plaintiffs' claims contending, among other things, that plaintiffs could not prove an intentional interference claim because they could not establish the fourth element of the claim—improper means or purpose—as a matter of law. According to defendants, plaintiffs could not show that defendants sold

the Durham property through improper means or with an improper purpose, because they could not show that the sale was inconsistent with the power of attorney or was motivated by anything other than a good faith intention to provide money for Madeline's care.

In response, plaintiffs argued that defendants had sold the Durham property with an improper purpose, in order to "protect or enhance their own inheritance at the expense" of plaintiffs. In support, they pointed to evidence that Madeline had enough income and other assets to pay for her care. They relied on the notes from the meeting between defendant Bruce Knudsen and Miller, the financial planner, which estimated Madeline's income as $3,700 per month and her expenses as $3,300 per month. They also pointed to evidence that Madeline had over $500,000 in other assets, and that defendants were aware of and had access to those funds to pay for Madeline's care.

Further, plaintiffs argued that selling the Durham property and refusing to turn over the proceeds to plaintiffs represented improper means. They argued that the sale and retention of the proceeds violated the power of attorney and constituted self-dealing because it was contrary to Madeline's wishes. In support, plaintiffs relied on evidence that Madeline intended for the Durham property to pass to plaintiffs, including the second codicil itself and statements by Madeline to plaintiffs after she was in the care facility that she was worried that defendants would sell the house. Additionally, they noted that defendant Bruce Knudsen had told Miller that, if he and his brother had to sell the Durham property to pay for Madeline's care, they would turn over any remaining proceeds to plaintiffs.

Following a hearing, the trial court granted defendants' summary judgment motion, concluding that plaintiffs failed to create an issue of fact as to whether defendants sold the property through improper means or with an improper purpose. In conjunction with that ruling, the trial court made the following determinations:

"1. Plaintiffs failed to produce evidence from which a reasonable finder of fact could conclude there was a question

of fact as to tortious or willful intent, improper [purpose] or improper means on the part of the Defendants in carrying out their obligations as Attorneys in Fact for the benefit of Madeline Grimstad under the Durable Power of Attorney;

"2. Defendants, as Attorneys in Fact under the Durable Power of Attorney of Madeline Grimstad, owed no obligation in carrying out those obligations to any other person than to their mother, Madeline Grimstad;

"3. Defendants owed no obligation to the Plaintiffs, and the Second Codicil of Madeline Grimstad, by its own terms, created no obligation or benefit to the Plaintiffs other than that the Durham property would go to Plaintiffs only if the Durham Property existed at the time of her death, which it did not, and therefore no further obligation was owed to Plaintiffs;

"4. The actions of Defendants, as Attorneys in Fact, for making the determination as to the sale of the property lay solely with the Defendants, and their actions were proper and they used proper means to accomplish that end;

"5. Defendants acted without improper [purpose], and all the monies received from the sale of the property were used for the benefit of Mrs. Grimstad;

"6. Defendants were entitled to make a judgment with respect to selling the property because they were responsible and obligated to use the monies in the best interest of Mrs. Grimstad, which they did by selling the property[.]"

On cross-appeal, plaintiffs largely reiterate the arguments that they made in the trial court, contending that "the improper purpose was the defendants' defeat of the known estate plan and betterment of their own prospective inheritances at the expense of the plaintiffs, and the improper means was the misuse by the defendants of the power of * * * attorney." Viewing the evidence in the light most favorable to plaintiffs, we conclude that plaintiffs failed to create a genuine issue of material fact on either of those issues. Therefore, the trial court did not err in granting defendants' motion for summary judgment.

In order to prove that a defendant acted with an improper purpose or by improper means, a plaintiff must

show that the "interference resulting in injury * * * is wrongful by some measure beyond the fact of the interference itself." *Top Service Body Shop v. Allstate Ins. Co.*, 283 Or 201, 209, 582 P2d 1365 (1978). Where the plaintiff's allegations are based on improper purpose, then the purpose "must be to inflict injury on the plaintiff 'as such.'" *Northwest Natural Gas Co. v. Chase Gardens, Inc.*, 328 Or 487, 498, 982 P2d 1117 (1999) (quoting *Top Service Body Shop*, 283 Or at 211); *see also Top Service Body Shop*, 283 Or at 212 (where the defendant's actions were "wholly consistent" with a proper purpose—advancing the defendant's business interests—they "did not suffice to support an inference of the alleged improper purpose to injure" the plaintiff); *Douglas Medical Center v. Mercy Medical Center*, 203 Or App 619, 632-33, 125 P3d 1281 (2006) (same). Where the theory of liability is based on the defendant's improper means, "then [those] means must violate some objective, identifiable standard, such as a statute or other regulations, or a recognized rule of common law, or, perhaps, an established standard of a trade or profession." *Northwest Natural Gas Co.*, 328 Or at 498. Examples of improper means include "violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehood." *Top Service Body Shop*, 283 Or at 210 n 11.

Here, plaintiffs' evidence did not create an issue of fact about the propriety of defendants' purpose. It is undisputed that, at the time defendants sold the Durham property, the cost and duration of Madeline's care was uncertain. There is also no dispute that defendants used all of the proceeds from the sale for Madeline's care. Thus, the sale of the house and the use of the proceeds to pay for Madeline's care were "wholly consistent" with the proper purpose of providing for Madeline's care and, therefore, were insufficient to support an inference that defendants' motive was to harm plaintiffs "as such." The fact that defendants' actions harmed plaintiffs' interests is, therefore, irrelevant.

Plaintiffs also failed to create an issue of fact on the wrongfulness of the defendants' means in selling the Durham property. Plaintiffs did not identify any "objective, identifiable standard" that defendants violated in selling the Durham property or in failing to reserve the proceeds for

plaintiffs' benefit. In particular, defendants' actions were consistent with their rights and duties as Madeline's attorneys-in-fact, which empowered them to sell any of Madeline's real property and required them to provide for her care. Moreover, those actions were permitted by the second codicil and the rest of Madeline's estate plan, which placed no constraints on defendants' ability to sell the Durham property or on their use of the proceeds from its sale. There was no directive from Madeline, in those documents or otherwise, mandating that defendants refrain from selling the Durham property or from using its proceeds to provide for Madeline's care.

Plaintiffs did not identify evidence that could lead a factfinder to conclude that defendants' conduct was "wrongful by some measure beyond the fact" that it interfered with plaintiffs' prospective inheritance. *Top Service Body Shop*, 283 Or at 209. Therefore, they did not create a disputed issue of fact on the wrongful means or purpose element of their intentional interference claim, and the trial court did not err in granting defendants' motion for summary judgment.

## CONCLUSION

In sum, we conclude that the trial court erred in concluding that plaintiffs proved a claim for unjust enrichment, because plaintiffs failed to show that they had any legal or equitable interest in the proceeds of the sale of the Durham property. For that same reason, the trial court erred in concluding that plaintiffs proved their claim of money had and received. The trial court therefore erred in granting plaintiffs relief on those claims. On cross-appeal, plaintiffs failed to put forward evidence to create any genuine issue of material fact with respect to the improper means or purpose element of their intentional interference with prospective economic advantage claim. The trial court therefore did not err in granting defendants' motion for summary judgment.

Reversed and remanded on appeal; affirmed on cross-appeal.